THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| Jaspal Singh Hare,<br><br>   *Plaintiff*,<br><br>  v.<br><br>Sanjay Pant,<br><br>   *Defendant*. | Civil Action No.: 2:22-cv-00189<br><br>JURY TRIAL DEMANDED |

## <u>ORIGINAL COMPLAINT</u>

1. This is an action for, *inter alia*, breach of contract and conspiracy to defraud in which Plaintiff Jaspal Singh Hare ("Plaintiff" or "Mr. Singh Hare") makes the following allegations against Defendant Sanjay Pant ("Defendant" or "Mr. Pant"). Put simply, Mr. Pant and his conspirators wanted to fire a hardworking attorney right before a big payday, and they resorted to unlawful and deceitful conduct to avoid express contractual payment terms.

### I. PARTIES

2. Plaintiff Mr. Singh Hare is an individual residing in Plano, Texas. Mr. Singh Hare is a licensed attorney specializing in patent litigation with over a decade of experience.

3. On information and belief, Defendant Mr. Pant is an individual residing at 433 N. County Line Road, Hinsdale, Illinois 60521.

### II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Defendant is a citizen of Illinois, and Plaintiff is a citizen of Texas; therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

5. Defendant is subject to this Court's specific and general personal jurisdiction

consistent with the principles of due process and/or the Texas Long Arm Statute.

6.      Personal jurisdiction exists generally over Defendant because Defendant has sufficient minimum contacts with the forum as a result of business conducted within the State of Texas and the Eastern District of Texas, and Defendant is or should be registered with the Secretary of State to do business in the State of Texas.  Personal jurisdiction also exists over Defendant because he, directly or through subsidiaries or intermediaries, sells, offers for sale, advertises, engages in, makes available, and/or markets services within the State of Texas and the Eastern District of Texas that are the subject of this lawsuit, as alleged more particularly below.

7.      Venue in this Eastern District of Texas is proper pursuant to 28 U.S.C. § 1391 because Defendant transacts business in this District, a substantial part of the events or omissions on which the claims asserted herein are based occurred in, or were directed towards, this District, and subject contracts were executed in this District.  In addition, on information and belief, a substantial part of property that is the subject of this action is located in this District.

### III.    BACKGROUND

8.      Mr. Singh Hare is a licensed attorney specializing in patent litigation with over a decade of experience.  He attended Indiana University and graduated with high distinction with a degree in Computer Information Systems.  He then spent several years working as a programmer before attending the University of Southern California Gould School of Law.  After graduating from law school in 2007, he spent four years in New York City working for the law firm of Cadwalader, Wickersham and Taft, where he learned how to properly vet and litigate patents. About 10 years ago, he relocated to the Dallas metro area and continued his career as a patent litigator.  Mr. Singh Hare is licensed to practice law in New York, California, and Texas and before numerous federal courts.  He is also a licensed patent attorney by the United States Patent and Trademark Office ("PTO").  He has also passed the Fundamentals of Engineering examination.

9.      Defendant Mr. Pant along with his business partner Mr. Gautham Bodepudi operate

a patent monetization concern called IP Edge LLC ("IP Edge").[1]  Both Mr. Pant and Mr. Bodepudi

are managing members of IP Edge.[2]  They also operate and exercise direction and control over

200 shell entities that have engaged in thousands of legal proceedings.[3]  These shell entities are

alter egos, joint venturers, and/or common enterprises of Mr. Pant.  IP Edge is described as follows:

> IP Edge has been the most litigious NPE plaintiff each year since
> 2014, and it has filed dramatically more litigation than any other
> plaintiff from 2010 onward—adding around 3,700 defendants
> during that period . . . .  IP Edge has followed the typical playbook
> of a file-and-settle NPE, litigation volume aside—namely, asserting
> its patents through numerous, short-lived district court suits, rarely
> engaging in substantive litigation, and usually dismissing its cases
> during the initial pleadings stage.[4]

10.     Mr. Pant and Mr. Bodepudi have known Mr. Singh Hare for over 10 years.  Before

the events described below, Mr. Singh Hare generally considered Mr. Pant and Mr. Bodepudi to

be his friends.  Mr. Pant and Mr. Bodepudi routinely solicited Mr. Singh Hare's services and

routinely sent me him patent cases to review.  However, Mr. Singh Hare has been cautious and

limited in his professional dealings with Mr. Pant and Mr. Bodepudi given their business/litigation

practices.

11.     Around June of 2019, Mr. Pant approached Mr. Singh Hare to provide

representation for a patent owner (the "Client") in relationship to certain patent litigation.  Mr.

Pant represented the Client as a patent broker and/or licensing agent through IP Edge.

12.     At the time that Mr. Pant approached Mr. Singh Hare, the Client had zero dollars

in its litigation budget and was seeking an attorney to take the matter on full contingency.  Mr.

Singh Hare recognized the size and complexities of the matter, and Mr. Singh Hare did not believe

that full contingency representation would be in the Client's best interest.  Instead, recognizing the

---

[1] Both Mr. Pant and Mr. Bodepudi attended law school and appear to be licensed attorneys.
However, on information and belief, they do <u>not</u> represent clients as lawyers, and they do <u>not</u>
adhere to ethical standards for lawyers (e.g., refraining from conflicts of interest).

[2] *See, e.g.,* http://www.ip-edge.com/team/ (last visited May 27, 2022).

[3] *See, e.g.,* https://insight.rpxcorp.com/entity/1034412-ip-edge-llc (last visited May 27, 2022).

[4] https://www.rpxcorp.com/data-byte/amid-a-steady-pace-of-litigation-and-continued-patent-
pickups-ip-edge-tries-a-case-at-the-itc/ (last visited May 27, 2022).

potential for the case if it were litigated properly, Mr. Singh Hare believed that the case would be a good candidate for litigation funding and proposed pursuing funding.  Mr. Pant and the Client agreed.  Mr. Pant then agreed in writing that if Mr. Singh Hare secured funding that the Client would be obligated to use Mr. Singh Hare's services.[5]  This agreement represented basic *good faith* and *fair dealing*.  Said another way, Mr. Pant could not just *bait and switch*—exactly what Mr. Pant would later do.

13.     Mr. Singh Hare then proceeded to work up the case over the next several months. At this time, Mr. Singh Hare was not being compensated for his time and efforts.  Mr. Singh Hare prepared a detailed strategy memorandum laying out the strategy for the entire case. Mr. Singh Hare approached his longtime friend and former colleague who now worked for a financial institution in New York City that provided litigation funding for patent litigation matters (the "Funder").  The Funder conducted its own independent analysis and review of Mr. Singh Hare's work product.  That review confirmed Mr. Singh Hare's analysis and strategic vision for the case. Around October of 2019, the Funder decided to invest and issued a term sheet.  The Funder agreed to commit millions of dollars in litigation funding with Mr. Singh Hare acting as lead counsel, while Mr. Singh Hare would be compensated at his normal hourly rate less a 25% discount in consideration for a 10% contingency fee.  The following table summarizes the hybrid deal:

---

[5] *See* Email from Mr. Pant to Mr. Singh Hare, dated July 17, 2019, attached hereto as **Exhibit 1**.

| Party | Contingency %[6] | Consideration/Risks |
|---|---|---|
| **Funder** | 28% | Committed  millions in capital |
| **Mr. Singh Hare** | 10% | Committed labor at 25% discount and years of his life[7] |
| **Client[8]** | 62% | De minimus[9] |
| **Total:** | **100%** | **Millions in funding and labor** |

14.    The Client agreed to the terms.  On November 19, 2019, the term sheet was fully executed.  The deal closed around June of 2020 with the signing of a formal funding agreement (the "Funding Agreement").  The Funding Agreement states (emphasis added):

*Name of Lead Attorney: Jaspal S. Hare.*

\*      \*      \*

Lead Law Firm has agreed with Claimant [(the Client)] that it, in comporting with the applicable rules of professional conduct, will use all commercially reasonable efforts to (i) *zealously represent Claimant in Claimant's pursuit of the Litigation and reasonable monetization of the Litigation through settlement or final judgment*; (ii) in good faith to maintain its representation of Claimant and its Engagement Agreement; and (iii) to not act to circumvent the economic terms of this Agreement.

\*      \*      \*

Claimant shall ***not*** be in material breach of any of its obligations under this Agreement or any other Transaction Document.

\*      \*      \*

Claimant represents, warrants and covenants, that (1) Claimant has entered into an engagement letter (the "Engagement Agreement") with Lead Law Firm and a true and correct copy of the Engagement Agreement is attached hereto as Exhibit A and (2) *Claimant shall **not** amend, restate or modify such Engagement Agreement or terminate Lead Law Firm without the prior written consent of*

[6] The Funding Agreement specified that the contingency fees are calculated as a percentage of net recovery after repayment of capital expended.
[7] Mr. Singh Hare also took the risk that if funding was lost or insufficient, that he would have to continue litigating the case effectively on a full contingency basis as withdrawal can only be effectuated with leave of court under local rules.  *See* E.D. Tex., Local Rule CV-11(c).
[8] On information and belief, Mr. Pant would be compensated out of the Client's recovery.
[9] The funding that Mr. Singh Hare secured for the Client was nonrecourse, so the Client had little to no downside risk.

> *Funder* (such consent not to be unreasonably withheld or delayed). *Claimant shall **not provide any instructions to Lead Law Firm that are inconsistent** with the terms of this Agreement or any other Transaction Document.*

15.     Mr. Singh Hare was a signatory to the Funding Agreement.

16.     The Client also formally retained Mr. Singh Hare through the law firm for which he worked for at that time (the "Firm").  A formal engagement letter was prepared, negotiated, and executed by the Client (the "Engagement Letter"), which was attached as an exhibit to the Funding Agreement.  The Engagement Letter unambiguously states that the Client "retained to represent [itself] in monetization, including litigation and licensing, involving [a certain patent] *with **Mr. Jaspal S. Hare** acting **as lead counsel** for enforcement of the [] Patent*."  The Engagement Letter further provided, *"[a]s **lead counsel** [Mr. Singh Hare] has authority to **control**, **manage**, **supervise**, and **coordinate** the Matters, including any litigations*."  This provision was material as it represented basic managerial control required for an attorney to manage a complex litigation; but, it also represented a firewall to prevent Mr. Pant and Mr. Bodepudi from interfering and engaging in suspect or abusive litigation tactics.[10]

17.     Although no one anticipated disengagement, the Engagement Letter included express terms governing terminating the relationship (emphasis added):

> If You [(the Client)] terminate our representation with respect to the Matters *for cause*, You agree the Firm will be entitled our legal fees incurred less the 25% discount for work performed prior to the termination for cause.[]  If You terminate our representation with respect to the Matters ***without cause***, You agree to pay our legal fees incurred less the 25% discount **plus** (1) the 10% contingency fee if it can be reasonably ascertained[FN4] or (2) if the 10% contingency fee cannot be reasonably ascertained, two times the value of the 25% discount. . . . .
>
> [FN4] By way of example and without limitation, the contingency fee would [be] "reasonably ascertainable" (as that

---

[10] Many years ago, Mr. Pant and Mr. Bodepudi had had another attorney file new patent litigations against dozens of new defendants on the same patent that Mr. Singh Hare was already litigating. They did this without informing Mr. Singh Hare of the new filings, much less seeking Mr. Singh Hare's approval.

phrase is used herein) based on an offer of settlement provided by an adverse party or a jury verdict.

If the Firm terminates our representation with respect to the Matters *without cause*, You agree the Firm will be entitled our legal fees incurred less the 25% discount for work performed prior to the termination without cause, to the extent provided for in the Funding Agreement.  If the Firm terminates our representation with respect to the Matters *for cause*, You agree to pay our legal fees incurred less the 25% discount for work performed prior to the termination **plus** (1) the 10% contingency fee if it can be reasonably ascertained or (2) if the 10% contingency fee cannot be reasonably ascertained, two times the value of the 25% discount.  ***Cause includes, without limitation, material breach by the Client of this Agreement or any agreement with [the Funder]***.

. . . .

Nothing in this section or the preceding section shall limit either parties' remedies in the event of a breach of this Agreement or related agreement.

18.     These provisions were material, and but-for their inclusion Mr. Singh Hare would not have agreed to represent the Client.

19.     Mr. Pant and Mr. Bodepudi were intimately involved in negotiating and drafting the Funding Agreement and the Engagement Letter.  They had actual knowledge of all terms of those agreements.

20.     Once the Funding Agreement was finalized, Mr. Singh Hare promptly prepared the case for litigation.  Around August 2020, a complaint was filed.

21.     The Client, due to Mr. Singh Hare's hard work and legal acumen, enjoyed tremendous success in litigation, and the case proceeded successfully towards trial.  For instance,

a.     a motion to stay pending *inter partes* review ("IPR") before the Patent Trials and Appeals Board ("PTAB") was denied by the district court;

b.     the PTAB denied institution of the IPR in decision on the merits and issued opinions that were extremely favorable to the Client's positions;[11] and

---

[11] Mr. Singh Hare personally drafted the patent owner's response leading to this denial.  He worked long hours in the weeks leading up to that filing, including pulling several all-nighters.

c.     the district court also issued a favorable claim construction opinion on all disputed terms after Mr. Singh Hare presented persuasive arguments at the *Markman* hearing.[12]

22.     Given the success enjoyed, all the relevant parties saw the drastically increasing probability of overall success on the merits at trial.

23.     Around May 2021, the parties agreed to have an independent damages expert prepare a damages expert report (the "Independent Damages Expert").  That report was prepared at the direction of Mr. Singh Hare and was based on Mr. Singh Hare's pre-suit damages analysis. The Independent Damages Expert's report substantiated Mr. Singh Hare's analysis and confirmed expected damages to be in the hundreds of millions of dollars.  Based on this analysis and the favorable litigation posture,[13] the team collectively decided to pursue bringing on *additional* counsel to act as *co*-lead-counsel with Mr. Singh Hare for trial.  At no time was replacing Mr. Singh Hare ever suggested by anyone (until later as described below).

24.     The team, consisting of Mr. Singh Hare, the Funder's representative, the Client's representative, local counsel, and Mr. Pant, among others, assembled a short list of elite attorneys and firms to interview.  At Mr. Pant's insistence, a certain law firm based in California ("Co-Counsel") was added to the short list.  Due to various reasons unrelated to the merits of the underlying patent litigation (such as capacity and timing), Co-Counsel was the only available counsel on the short list of firms.  On or around July 15, 2021, the team agreed to retain Co-Counsel.  A deal was reached where Co-Counsel was to be paid its full hourly fee without discount

---

[12] Mr. Singh Hare personally drafted all claim construction briefing and handled related depositions.  He worked long hours in the months leading up to the *Markman* hearing, including pulling at least 6 all-nighters.  On the day of the *Markman*, Mr. Singh Hare woke up at 4 am after only an hour of sleep.  After getting himself ready, he then drove from his home in Plano, Texas to pick up the Client's representative from his home in Rockwall, Texas, and then drove to the courthouse in Marshall, Texas.  Mr. Singh Hare then first chaired a successful *Markman* hearing. And then, he did the drive in reverse.

[13] At this time, the team strongly believed that the IPR would be denied (which proved true).  The relative strength of the claim construction briefing also indicated to the team that the Client would likely be successful at the *Markman* hearing (which also proved trued).

and without contingency fee.  The Funder agreed to increase its capital commitment by several million to cover Co-Counsel's full budgeted fees.  No changes were proposed to Mr. Singh Hare's compensation or authority.

25.     After reaching a deal in principle, on July 15, 2021, Co-Counsel appeared in the district court action.  The parties then began to prepare formal papers to amend the Funding Agreement.   On July 23, 2021, the Funder's representative distributed a draft amendment document to the Funding Agreement.  The draft amendment document stated that Co-Counsel would be "***another*** Lead Law Firm."  On the same day, Mr. Pant distributed to the team a draft engagement letter between Co-Counsel and the Client.  Neither this draft engagement letter nor the final draft included the management and control provisions (quoted *supra*) contained in Mr. Singh Hare's Engagement Letter.   The amendment documents (the "Amended Funding Agreement") were finalized on or around August 5, 2021.[14]  No changes were made to Mr. Singh Hare's Engagement Letter.

26.     Everyone contemplated *a good co-counsel relationship*, where the Client had the benefit of Mr. Singh Hare's vision and continuity of legal strategy as well as additional manpower to be provided by Co-Counsel.  It was anticipated that Mr. Singh Hare would continue to manage, coordinate, and work up the matter, which included Mr. Singh Hare continuing to take the lead on PTO proceedings, settlement negotiations, and also supporting the day-to-day district court litigation.  It was contemplated that adding Co-Counsel would continue business as usual and not change the management teams operating practices.[15]  It was also contemplated that Co-Counsel would eventually take over the day-to-day activities for the district court litigation to free up Mr.

---

[14] The Client executed on July 27, 2021; Co-Counsel executed on July 28, 2021; and Mr. Singh Hare executed on July 29, 2012.  The final Amended Funding Agreement was delivered on August 5, 2021.

[15] Although Mr. Singh Hare had the express contractual authority to manage and control, he never had to pull-rank, so to speak.  Instead, he exercised leadership through committee and by building consensus, e.g., by holding one-on-one calls and also weekly status/strategy calls that included the Client's representative, local counsel, Mr. Pant, and Mr. Bodepudi.  Bizarrely, Co-Counsel upon joining his first weekly call canceled all further status/strategy calls.

Singh Hare's time.[16]

27.     Throughout the onboarding process, Mr. Pant (and Mr. Bodepudi) acted as liaison between Co-Counsel and the existing team.  The amended deal was based on a new litigation budget that had been prepared by Mr. Pant (with input from the team and Co-Counsel) (the "7/13 Budget").  That budget included a line item with $1.2+ million in discounted hourly fees for Mr. Singh Hare's continued role thru trial, e.g., as shown (highlighting and color in original; alteration added):

| Legal Fee Overlap | |
|---|---|
| | How much of work related to [Mr. Singh Hare's] 1.2M Legal fee budget corresponds to co-counsel work (e.g., how much overlap is there?) |
| 0% | |

On July 13, 2021, Mr. Pant transmitted the budget to the Funder (and the team) for the purposes of securing additional funding to cover Co-Counsel's budgeted fees.  Mr. Singh Hare expressly relied on the representations contained in this budget in providing his approval for the Amended Funding Agreement.

28.     In addition, the Funder relied on the figures in the 7/13 Budget to compute the final funding amounts contained in the Amended Funding Agreement.

29.     Mr. Pant also used the amendment process to include terms that provided a $100,000 payment to IP Edge (controlled by Mr. Pant) and provided a $500,000 payment to the Client (of which a substantial portion would also go to IP Edge).  These payments were not in consideration for *value-adding work*.  These payments substantially reduced the value of Mr. Singh Hare's contingency fee interest.

30.     Mr. Pant (and/or Mr. Bodepudi) also drafted portions of Co-Counsel's engagement

---

[16] At  around this time, Mr. Singh Hare was also leading the vetting of two other patent portfolios for assertion that were referred to him by Mr. Pant, one of which had been approved for funding. Mr. Singh Hare's wife was also pregnant with their second child (due March 2022).  Freeing up Mr. Singh Hare's time from handling all day-to-day litigation activities was a substantial motivation for bring on Co-Counsel.  Nevertheless, at all times, Mr. Singh Hare and his former firm were prepared and ready to try the case without assistance from Co-Counsel.

letter.[17]   However, Mr. Pant never provided Co-Counsel with the original Funding Agreement (which included the Engagement Letter) that was being amended.[18]   The amendment document was a short, separate document that amended certain paragraphs of the original Funding Agreement.  As such, reviewing only the amendment document did not apprise one of the entire deal.  Without seeing the original Funding Agreement, on information and belief, Co-Counsel had no idea that the Client had contractually delegated authority to manage and control the matters solely to Mr. Singh Hare.[19]   Shockingly, Co-Counsel executed the amendment document never having seen the original Funding Agreement, nor the Engagement Letter.

31.     All these things led to friction in the team.  For instance, Co-Counsel immediately upon joining the team attempted to terminate existing local counsel.  There was no reason for this as local counsel had been a valuable member of the team since the inception of the lawsuit and had participated in all decisions related to the case.  Mr. Singh Hare strongly objected to firing her. At one point, he told Co-Counsel that *if you want to fire local counsel, you are going to have to do it yourself*.  Eventually, local counsel was terminated.

32.     In another example of friction, the *Markman* hearing was scheduled for July 28, 2021.  Given that Mr. Singh Hare had prepared all briefing and was familiar with all aspects of the case, it only made sense for Mr. Singh Hare to take the lead at the *Markman* hearing; he so informed the team.  In response, on or around July 15, 2021, Mr. Bodepudi called Mr. Singh Hare and told him to let Co-Counsel *call all the shots*.  This made little sense at the time.  It made little

---

[17] Portions of Co-Counsel's engagement letter are copy and pasted from Mr. Singh Hare's Engagement Letter.

[18] During a call on August 6, 2021 between Mr. Singh Hare and Co-Counsel, Co-Counsel stated that he was unaware of the management and control provisions contained in Mr. Singh Hare's Engagement Letter as he had never seen the original Funding Agreement, nor the Engagement Letter.  Mr. Singh Hare then sent the original Funding Agreement (including the Engagement Letter) to Co-Counsel.

[19] Mr. Singh Hare would not have agreed to the Amended Funding Agreement without continued control of the matters.  This is because, among other reasons, Mr. Singh Hare took the risk that (to protect his contingency interest) he may have to litigate the case without hourly compensation if funding was lost or insufficient.  In that scenario, Co-Counsel would presumably quit, while Mr. Singh Hare would be left litigating without funding.

sense why Mr. Bodepudi (who had no managerial role) would interject himself when Co-Counsel could and should have just called himself to coordinate for the hearing.  It also made little sense why Mr. Bodepudi thought Co-Counsel—who had just appeared and had no possible way to get up to speed on the complex technology and legal issues—should be calling all the shots on day one.  It also made little sense why Mr. Bodepudi wanted one person to unilaterally call all the shots given the team should be consulted on important decisions and a consensus formed as to a course of action as had been the team's operating procedure.

33.     Unbeknownst to Mr. Singh Hare (and presumably other team members) at this time, Mr. Pant and Mr. Bodepudi had been plotting to *replace* Mr. Singh Hare.

34.     On the evening of August 4, 2021, Mr. Pant and Mr. Bodepudi initiated a series of impromptu, informal teleconferences with Mr. Singh Hare.  Mr. Pant and Mr. Bodepudi informed Mr. Singh Hare that they wanted Mr. Singh Hare to have *nothing to do with the case* and that they wanted Mr. Singh Hare to *completely step aside*.  They also informed Mr. Singh Hare they did not want him working on two other lucrative patent litigation portfolios, both of which Mr. Singh Hare had already invested significant time working up without compensation.  They provided no cogent explanation or justification for their actions.  Mr. Singh Hare explained that those instructions would result in a  breach of the contracts, among other things.

35.     Mr. Singh Hare summarized this breach in writing (Aug. 6, 2021 at 12:13 PM) (emphasis added):

> Gau/Sanjay, the [funding] agreements provide: "As lead counsel, the [Mr. Singh Hare] has authority to **control, manage, supervise, and coordinate** the Matters, including any litigations" (I didn't see this in [Co-Counsel's] engagement letter); "Lead Law Firm . . . use all commercially reasonable efforts to (i) *zealously* represent Claim . . . through settlement or final judgment"; "*Claimant shall **not** provide any instructions to lead law firms that are inconsistent with the terms of this agreement or any other Transaction Document*." If the client had instructed me not to manage, nor supervise, nor coordinate, it would appear to be a breach. I don't need an apology but I did spend from about 1 am to 5 am yesterday re-going through all the agreements; no more going below the belt or amateur hour.

36.     Thereafter, Mr. Pant and Mr. Bodepudi changed tactics to do what they could not do directly, and they began an active and express strategy to freeze-out  Mr. Singh Hare.[20]  Indeed, Mr. Pant and Mr. Bodepudi informed the Client's representative, the Funder's representative, and Co-Counsel, *inter alia*, that they were no longer going to work with  Mr. Singh Hare.  Thereafter, the Client's representative and Co-Counsel also began freezing-out Mr. Singh Hare.

37.     On information and belief, Mr. Pant's actions were motivated by greed.  Mr. Pant desired to avoid the termination provisions and associated contractual payment terms that would have required payment of a "reasonably ascertainable" amount for the 10% contingency fee.[21]  Hence, instead of simply terminating Mr. Singh Hare, Mr. Pant chose to freeze-out Mr. Singh Hare.  Thereby, Mr. Pant believed he could effectively terminate Mr. Singh Hare without having to pay the contractual 10% contingency fee or other contractual fees.   In particular, the 10% contingency fee, Mr. Pant believed, would revert to the Client and thus increase the amount Mr. Pant himself was entitled to as licensing agent.

38.     Despite   Mr.   Pant   and   others'   tortious   conduct,   Mr.   Singh   Hare   continued performing his duties as best he could under the circumstances.  He handled the *Markman* hearing,

---

[20] Freeze-out (also called squeeze-out) tactics are well known and are oppressive, *see, e.g.*, in an analogous context (emphasis added):

> By the term "squeeze-out" is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants. . . . [A] "partial squeeze-[out]" . . . is [an] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled.  *A squeeze-out normally does **not contemplate fair payment** to the squeezees for the interests, rights, or powers which they lose.*

F. Hodge O'Neal & Robert B. Thompson, OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS, at § 1:1.

[21] The 10% contingency fee amount was "reasonably ascertainable" given the litigation posture, the Independent Damages Expert's analysis, representations to the Funder, and the Funder's own internal models.

obtaining favorable constructions for all disputed terms; he participated in depositions and witness preparation; and he reviewed and revised draft papers including expert reports.

39.     Eventually, around November 2021, without consulting Mr. Singh Hare, the Client had another attorney appear and file papers to have Mr. Singh Hare removed from the court's docket in the underlying patent litigation.

40.     The underlying patent case settled around January 2022.

41.     Mr. Singh Hare was prevented from earning his budgeted hourly legal fees, and he was never paid the 10% contingency fee.[22]  Mr. Singh Hare's reputation has also been damaged.

## IV.    COUNT I (Breach of Contract)

42.     Based on **Exhibit 1** and a course of dealing, among other things, a contract exists where Mr. Pant agreed to use Mr. Singh Hare's services if the Funder was used (hereinafter the "7/17/2019 Agreement").

43.     Mr. Pant expressly and materially breached this agreement by, *inter alia*, telling Mr. Singh Hare that he did not want him to represent the Client who had obtained funding subject to the 7/17/2019 Agreement and then freezing-out Mr. Singh Hare.  Mr. Pant's conduct also breached the covenant of good faith and fair dealing germane to all contracts.

44.     Mr. Singh Hare has been substantially harmed by Mr. Pant's breach of the 7/17/2019 Agreement as he was not allowed to earn the fees he was entitled to earn.

## V.    COUNT II (Fraud)

45.     Fraud occurs when: (1) a party makes a material misrepresentation; (2) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; (3) the misrepresentation is made with the intention that it should be acted on by the other party; and (4) the other party relies on the misrepresentation and thereby suffers injury.

46.     Here, Mr. Pant defrauded Mr. Singh Hare by making affirmative

---

[22] On information and belief, Mr. Singh Hare's former law firm was never paid the 10% contingency fee either.

misrepresentations (e.g., contained in budgets and the Amended Funding Agreement) that were intended to obtain Mr. Singh Hare's signature on the Amended Funding Agreement.

47.     *First*, Mr. Pant made at least the following material misrepresentations (and/or omissions):

a.     Mr. Pant misrepresented in the 7/13 Budget (that he himself transmitted to the Funder and team) that $1.2+ million was allocated for Mr. Singh Hare's continued involvement thru trial.  This was a material misrepresentation because Mr. Pant actually desired Mr. Singh Hare to have nothing to do with the litigation as he stated on the August 4th teleconferences, thereby leaving Mr. Singh Hare with no way to earn the budgeted hourly fees.  The misrepresentation was material because but-for the budgeted hourly fees and the 10% contingency fee, Mr. Singh Hare would never have agreed to the Amended Funding Agreement.

b.     Mr. Pant also misrepresented that Mr. Singh Hare would be co-lead counsel with express authority to manage and coordinate the matters.  This was a misrepresentation (by failing to reveal his true intentions) because Mr. Pant actually desired Mr. Singh Hare to have nothing to do with the litigation as he stated on the August 4th teleconferences, thereby his intent was Mr. Singh Hare would have no managerial authority contrary to the express terms of the Engagement Letter (whose provisions were re-affirmed by the Amended Funding Agreement).  The misrepresentation was material because but-for management and control provisions, Mr. Singh Hare would never have agreed to the Amended Funding Agreement.  *See* fn. 19 *supra*.

48.     *Second*, Mr. Pant made the misrepresentations with knowledge of their falsity or at least made the misrepresentations recklessly without any knowledge of the truth and as a positive assertion.  Mr. Pant had actual knowledge of the Engagement Letter that he himself negotiated and of the 7/13 Budget he himself submitted.  Mr. Pant also had knowledge of his own personal desires

to sideline Mr. Singh Hare as he made clear during the August 4th teleconferences, but he omitted disclosing his desires to the team prior to the deal closing.  The fact that Mr. Pant kept Co-Counsel in the dark as to the original Funding Agreement (which included the Engagement Letter) demonstrate that Mr. Pant knew and appreciated the falsity of the representations (particularly the management and control provisions).  Mr. Pant also kept Mr. Singh Hare in the dark as to the fact that Co-Counsel had not been provided the original Funding Agreement.  Indeed, Mr. Pant (and Mr. Bodepudi) had formed an intent to sideline Mr. Singh Hare at least as early as July 15, 2021, when Mr. Bodepudi called Mr. Singh Hare and stated Mr. Singh Hare should let Co-Counsel *call the shots*.  These facts evidence Mr. Pant's scienter and his appreciation for the fact that he knew he could not lawfully achieve his objective of freezing-out Mr. Singh Hare, and thus he intentionally resorted to deceit.

49.     *Third*, Mr. Pant made the misrepresentations (and omission of disclosing his true intentions) with the intention that they should be acted on by Mr. Singh Hare, i.e., to induce Mr. Singh Hare to sign the Amended Funding Agreement.  Mr. Pant intentionally copied Mr. Singh Hare on the transmission of the 7/13 Budget to the Funder to induce Mr. Singh Hare (and the Funder) into believing sufficient funds were being allocated for his continued role.  At all times, Mr. Pant indicated his approval (he did not voice any objection) of the Amended Funding Agreement, thereby he evidenced to all parties that he intended and desired that the agreements and all their terms would be honored.  Thus, Mr. Singh Hare was led to believe that the deal as presented to the Funder would be honored, and he would be allowed to earn the budgeted $1.2+ million in discounted hourly fees as well as the 10% contingency fee.  Indeed, Mr. Singh Hare signed the Amended Funding Agreement based on the representations contained in the Amended Funding Agreement and the 7/13 Budget.  Most tellingly, Mr. Pant intentionally waited until August 4th to reveal his true desires to sideline Mr. Singh Hare—mere days after having obtained Mr. Singh Hare's signature on the Amended Funding Agreement.

50.     *Fourth,* Mr. Singh Hare relied on those misrepresentations (and/or omissions) and thereby suffered injury to his detriment as he found out during the phone calls of August 4th, where

Mr. Pant informed Mr. Singh Hare his services are no longer wanted.  Mr. Singh Hare was actually harmed because he was never paid the budgeted $1.2+ million in hourly fees nor the 10% contingency fee.  Mr. Singh Hare also suffered substantial injury to his professional reputation.

51.    *Last,* no justification existed for Mr. Pant's conduct.  It is noteworthy that the Engagement Letter expressly provided the Client with the right to terminate Mr. Singh Hare, yet neither the Client nor Mr. Pant ever attempted to terminate Mr. Singh Hare pursuant to those contractual provisions.  Indeed, at one point around August of 2021, Mr. Pant informed the Funder's representative that there was no "cause" for terminating Mr. Singh Hare and that the Client was happy with Mr. Singh Hare's performance to date.  This shows that Mr. Pant appreciated the contractual situation and that he deliberately chose an unlawful course of action to unlawfully vitiate the contractual payment terms.

## VI.    COUNT III (Intentional Interference with Existing Contract)

52.    There are four elements for the tort of intentional interference with a existing contract: (1) a contract subject to interference, (2) an act of interference that was willful and intentional, (3) the act being a proximate cause of the plaintiff's damage, and (4) actual damage or loss.

53.    Here, Mr. Pant intentionally interfered with at least the contracts represented by the Engagement Letter, the Funding Agreement,  and also Mr. Singh Hare's employment contract with his former firm.

54.    *First*, there existed at least three valid, enforceable contracts subject to interference: (1) a contract represented by the Engagement Letter signed by the Client's representative and Mr. Singh Hare; (2) a contract represented by the Funding Agreement and Amended Funding Agreement, both signed by Mr. Singh Hare; and (3) an employment contract between Mr. Singh Hare and his former law firm.  The Engagement Letter states "Mr. Jaspal Hare acting as lead counsel for enforcement . . ." and granted Mr. Singh Hare express authority to manage and coordinate the matters. The Funding Agreement expressly required Mr. Singh Hare to "zealously"

represent the Client and prohibited the Client from issuing of instructions contrary to the terms of the Funding Agreement.  Mr. Singh Hare's employment agreement also imposed obligations on him to collect duly earned fees and for the Firm then to duly pay him on those fees, among other things.  Mr. Pant had actual knowledge of all the above contracts and relevant terms therein.

55.     *Second*, Mr. Pant committed an act of interference that was willful and intentional. For instance, during the August 4th teleconferences, Mr. Pant's instructions (i.e., that Mr. Singh Hare should have nothing further to do with the case) was willful and intentional and constituted interference as Mr. Singh Hare explained in no uncertain terms (Aug. 6, 2021 at 12:13 PM) (emphasis added):

> Gau/Sanjay, the [funding] agreements provide: "As lead counsel, the [Mr. Singh Hare] has authority to control, manage, supervise, and coordinate the Matters, including any litigations" (I didn't see this in [Co-Counsel's] engagement letter); "Lead Law Firm . . . use all commercially reasonable efforts to (i) zealously represent Claim . . . through settlement or final judgment"; *"Claimant shall **not provide any instructions** to lead law firms that are **inconsistent** with the terms of this agreement or any other Transaction Document*." *If the client had instructed me not to manage, nor supervise, nor coordinate, it would appear to be a **breach***. I don't need an apology but I did spend from about 1 am to 5 am yesterday re-going through all the agreements; no more going below the belt or amateur hour.

56.     Even after that communication expressly warning Mr. Pant of his unlawful conduct, Mr. Pant did nothing to cure but instead began (or continued) willfully and intentionally freezing-out Mr. Singh Hare.  Mr. Pant instructed and/or induced the Client to also begin freezing-out Mr. Singh Hare.  For instance, the Client's representative cancelled (and never rescheduled) a meeting with Mr. Singh Hare that had been scheduled for August 8, 2021 precisely to discuss Mr. Pant's interference; the Client also failed to inform Mr. Singh Hare of a reexamination that was filed on August 30, 2021.  Mr. Pant caused Co-Counsel to also begin freezing-out Mr. Singh Hare.  Mr. Pant also informed the Funder that he had ceased working with Mr. Singh Hare.  These actions caused the Client to breach its contractual and other duties, e.g., to keep Mr. Singh Hare, as counsel of record, fully informed.

57.     *Third*, Mr. Pant's acts were the proximate cause of damage to Mr. Singh Hare.  Mr. Pant's acts destroyed the good working relationship Mr. Singh Hare had enjoyed with the Client, the Funder, and others. Mr. Pant's acts resulted in the Client's representative stopping normal communication with Mr. Singh Hare and prevented Mr. Singh Hare from participating in critical litigation proceedings.  Specifically, Mr. Pant's actions led to the Client refusing to pay Mr. Singh Hare the 10% contingency fee he was entitled and prevented him from earning the $1.2+ million in budgeted hourly fees.

58.     *Fourth*, Mr. Singh Hare suffered actual damage or loss, e.g., Mr. Singh Hare was prevented from earning the budgeted $1.2+ million in hourly fees and was never paid the 10% contingency fee.  Mr. Singh Hare also suffered actual damage to his professional reputation as a result of Mr. Pant's conduct.

59.     *Last,* no justification existed for Mr. Pant's conduct.  It is noteworthy that the Engagement Letter expressly provided the Client with the right to terminate Mr. Singh Hare, yet neither the Client nor Mr. Pant ever attempted to terminate Mr. Singh Hare pursuant to those contractual provisions.  Indeed, at one point around August of 2021, Mr. Pant informed the Funder's representative that there was no "cause" for terminating Mr. Singh Hare and that the Client was happy with Mr. Singh Hare's performance to date.  This shows that Mr. Pant appreciated the contractual situation and deliberately chose an unlawful course of action to avoid the contractual payment terms.

## VII.   COUNT IV (Wrongful Interference with Prospective Contractual or Business Relations)

60.     The tort of wrongful interference with prospective contractual or business relations has four elements: (1) the existence of a reasonable probability that the parties would have entered into a contractual or business relationship, (2) the actor committed an independently tortious or unlawful act that was a substantial factor in preventing the contractual or business relationship from occurring, (3) the actor acted with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of

his conduct, and (4) the complainant suffered actual harm or damage as a result of the interference.

61.     *First*, there existed a reasonable probability that the parties would have entered into a contractual or business relationship with respect to a another patent controlled by the Client (the "Solar Portfolio").  Over the Spring to Summer of 2021, the Client, the Funder, and Mr. Singh Hare had engaged in substantial activities vetting and preparing a patent infringement action involving the Solar Portfolio.  Mr. Singh Hare had worked up that portfolio and in good faith submitted the opportunity to the Funder who agreed to fund the litigation.  On July 2, 2021, the Funder provided a term sheet for this deal.  The material terms were agreeable to the Client, and the Client via Mr. Pant transmitted a revised term sheet to the Funder on August 10, 2021.  The parties intended that Mr. Singh Hare would be lead counsel for this action, and the term sheet expressly designated Mr. Singh Hare's former law firm as lead counsel.  The term sheet further specified that Mr. Singh Hare would be compensated at 75% of his hourly rate plus a 10% contingency fee.  Mr. Singh Hare expected to earn millions in legal fees from this deal.

62.     *Second*, Mr. Pant committed an independently tortious or unlawful act that was a substantial factor in preventing the contractual or business relationship from occurring.  As described above, Mr. Pant's conduct constituted a breach of contract, fraud, and interference with an existing contract.  For instance, Mr. Pant's instructions during the August 4th teleconferences (i.e., that Mr. Singh Hare should have nothing further to do with this Solar Portfolio as well as others) was also an independent breach of contract as the parties had formed an agreement in principle based on the term sheets and a course of dealing.  Mr. Pant also instructed and/or induced the Client to also begin freezing-out Mr. Singh Hare in breach of contractual and other duties (e.g., the Client's representative cancelled and never rescheduled a meeting with Mr. Singh Hare that had been scheduled for August 8, 2021 precisely to discuss Mr. Pant's interference).  Mr. Pant also informed the Funder's representative that he would no longer work with Mr. Singh Hare, thereby casting a shadow over the entire legal team's ability to operate as a *team* and to litigate the case successfully.

63.     Mr. Pant's actions also represented a breach of his contractual and fiduciary duties

to the Client for whom Mr. Pant acted as a licensing agent.  More specifically, Mr. Pant's act of informing the Funder and the Client that he would no longer work with Mr. Singh Hare represented a breach of his duties to provide services to the Client in good faith.  Mr. Pant also deprived the Client of valuable counsel of Mr. Singh Hare in breach of his duties to the Client.  Mr. Pant's insertion of payments to IP Edge amount to self-dealing.

64.     *Third*, Mr. Pant acted with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct.  Mr. Pant had been expressly warned by Mr. Singh Hare that his conduct would result in the Solar Portfolio deal crashing: "Sanjay, happy Friday. If [the Solar Portfolio] deal crashes and burns, I won't be [] able to meaningfully help *if y'all are **not** talking to me*" (Aug. 13, 2021 at 10:14 AM).

65.     In spite of that warning, Mr. Pant continued his freeze-out strategy.  Pursuant to Mr. Pant's freeze-out strategy, Mr. Pant did not respond to that communication.  Mr. Pant caused the Client to begin freezing-out Mr. Singh Hare, including on this Solar Portfolio deal.   The Solar Patent deal never closed, and Mr. Pant's acts were a substantial factor in preventing the contractual or business relationship from occurring.

66.     *Fourth*, Mr. Singh Hare suffered actual harm or damage as a result of the interference as the deal never closed, and Mr. Singh Hare lost out on the opportunity to earn millions in legal fees.  Mr. Singh Hare's professional reputation was also substantially damaged as a result of Mr. Pant's conduct.

## VIII.   COUNT V (Conspiracy)

67.     A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  The elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

68.     Here, generally, Mr. Pant entered into a conspiracy with at least Mr. Bodepudi to unlawfully try to fire Mr. Singh Hare before a big payday to increase payments to themselves.

69.     *First*, Defendant Mr. Pant conspired with at least Mr. Bodepudi.  Both were present on the August 4th teleconferences.  At one point during those calls, they dropped off to confer with one another, and thereafter they collectively made an express decision to tell Mr. Singh Hare that he should have nothing further to do with the case (and the other prospective deals).  Thereafter, both coordinated their actions to actively freeze-out Mr. Singh Hare.

70.     On information and belief, Mr. Pant and Mr. Bodepudi conspired with others.

71.     *Second*, the object of Mr. Pant and his conspirators was to terminate Mr. Singh Hare's representation of the Client while avoiding the express contractual payment terms.  Another object of the conspiracy was to deprive Mr. Singh Hare his ability to earn his hourly and contingency fee, thereby those monies would fall to Mr. Pant and his conspirators.  Another object of their conspiracy was to sideline Mr. Singh Hare so that they could engage in self-dealing (e.g., by including payments to IP Edge).

72.     *Third,* Mr. Pant and his conspirators agreed on a course of action comprising, among other things, avoiding terminating Mr. Singh Hare pursuant to the contractual provisions permitting termination without cause and instead telling Mr. Singh Hare to *step aside* on the August 4th calls.  After Mr. Singh Hare expressly notified them that that course of action breached contracts, they agreed on a course of action of freezing-out Mr. Singh Hare, thereby making it impossible for Mr. Singh Hare to fully perform his duties and earn the fees that he was promised and duly entitled to earn.  On information and belief, Mr. Pant caused others to agree on the same course of action and also to freeze-out Mr. Singh Hare.

73.     *Fourth*, Mr. Pant and his conspirators did thereafter engage in unlawful, overt acts. For example:

        a.     Mr. Pant and Mr. Bodepudi on the conference call of August 4th engaged in the unlawful, overt act of telling Mr. Singh Hare to have nothing to do with the Client's case, thereby unlawfully breaching various provisions of the

Funding Agreement (e.g., the provision requiring Mr. Singh Hare to zealously represent the Client and the provision prohibiting the Client from providing lead counsel with contrary instructions).

b.     Thereafter, with express knowledge that their behavior would breach contracts, Mr. Pant and his conspirators made the unlawful, overt act to not communicate with Mr. Singh Hare, thereby actually freezing-out Mr. Singh Hare.[23]   These freeze-out actions were unlawful because Mr. Pant and Mr. Bodepudi had affirmative contractual and fiduciary duties to the Client as licensing agents.

c.     Mr. Pant also took the unlawful, overt act to encourage the Client to also begin freezing-out Mr. Singh Hare.[24]   They thus induced the Client to breach its contractual and legal duties to Mr. Singh Hare who was counsel of record (e.g., to keep Mr. Singh Hare fully informed).

d.     Although Mr. Pant and Mr. Bodepudi desired to terminate Mr. Singh Hare's representation of the Client, on information and belief, they made the unlawful, overt act to discourage the Client from exercising its express contractual rights to terminate Mr. Singh Hare.  They did this to avoid having to pay Mr. Singh Hare amounts owned in the event of termination, thereby increasing payments to themselves.

e.     Mr. Pant also took the unlawful, overt act to keep Co-Counsel in the dark (by failing to ever provide Co-Counsel with the original Funding

---

[23] Mr. Pant and his conspirators also took the overt act to freeze-out local counsel who was a valuable member of the team since the inception of the underlying lawsuit and eventually terminated her representation for no good reason.

[24] For example, the Client cancelled a meeting with Mr. Singh Hare scheduled for August 8, 2021, which was never rescheduled.  The Client also never informed Mr. Singh Hare a reexamination had been filed although it was contemplated that Mr. Singh Hare would continue to take the lead on PTO proceedings.  The Client also never informed Mr. Singh Hare about settlement negotiations.

Agreement nor the Engagement Letter) as to the true terms of the agreements including the provision granting Mr. Singh Hare rights to manage and control the litigation.  On information and belief, this was done to create friction in the team and thus unlawfully fabricate "cause" to terminate Mr. Singh Hare.

f.    Mr. Pant and his conspirators also took the unlawful, overt act of engaging in self-dealing by placing their own interests ahead of their Client.  They did this by taking the overt steps of including a $100,000 payment to IP Edge in the Amended Funding Agreement; they also inserted a $500,000 "working capital" payment (of which a substantial portion would go to Mr. Pant) into the Amended Funding Agreement.  They also inserted a $100,000 payment to IP Edge into the Solar Portfolio deal; they also inserted a $500,000 "working capital" payment (of which a substantial portion would go to Mr. Pant) into the Solar Portfolio deal.  On information and belief, none of these special payments had any business justification (such as covering out of pocket expenses).

74.    *Fifth*, Mr. Singh Hare was substantially damaged as a proximate result of Mr. Pant and his conspirators' unlawful actions as Mr. Singh Hare was not allowed to earn his budgeted hourly fees nor was paid his 10% contingency fee.  He was further deprived of his contractual rights to manage and control the underlying matters.   His professional reputation was further substantially damaged.

## IX.    PRAYER FOR RELIEF

75.    WHEREFORE, Plaintiff Mr. Singh Hare respectfully requests that this Court:

a.    Enter judgment in favor of Plaintiff and against Defendant on each count;

b.    Enter judgment in favor of Plaintiff that Defendant's conduct was willful, deliberate, and egregious;

c.      Award Plaintiff all monetary relief available under the laws of the United States and Texas, including but not limited to actual and/or compensatory damages, pre-judgment and post-judgment interest, enhanced damages, punitive damages, and costs;

d.      Enjoin Defendant and his conspirators, their officers, subsidiaries, agents, servants, and employees, and all persons in active concert with any of the foregoing, from further tortious conduct directed towards Plaintiff;

e.      Award reasonable and necessary attorney's fees; and

f.      Grant Plaintiff all such other relief as the Court deems just and equitable.

## X.     DEMAND FOR JURY TRIAL

76.     Plaintiff Mr. Singh Hare, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED June 2, 2022.                         Respectfully submitted,

                                            */s/ Jaspal Singh Hare*
                                            By: _____

                                            Jaspal Singh Hare
                                            Texas Bar No. 24083135 (admitted in E.D. Tex.)
                                            Jaspal@SinghHare.com
                                            SINGH HARE PLLC
                                            100 Crescent Ct., Ste. 700
                                            Dallas, TX 75201
                                            +1 317.294.7132 (mbl.)

                                            *Counsel for Plaintiff Jaspal Singh Hare*